**NOTICE**
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2021 IL App (4th) 200316-U

NO. 4-20-0316

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

**FILED**
May 14, 2021
Carla Bender
4th District Appellate
Court, IL

| | |
|---|---|
| *In re* MARRIAGE OF CHARLES S. FISHER,         Petitioner-Appellant,         and PENNY S. FISHER,         Respondent-Appellee. | ) Appeal from the ) Circuit Court of ) McLean County ) No. 16D376 ) ) Honorable ) Sarah R. Duffy, ) Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court.
Presiding Justice Knecht and Justice Harris concurred in the judgment.

**ORDER**

¶ 1     *Held*: (1) The circuit court did not abuse its discretion by requiring petitioner to make respondent a beneficiary of the survivor benefit of his pension plan.

(2) By finding that petitioner failed to prove, by clear and convincing evidence, that he did not intend a gift by contributing $200,000 toward the purchase of a house conveyed to the parties in joint tenancy, the circuit court did not make a finding that was against the manifest weight of the evidence.

¶ 2     The circuit court of McLean County dissolved the marriage of petitioner, Charles S. Fisher, to respondent, Penny S. Fisher. Petitioner appeals, challenging two features of the court's judgment.

¶ 3     First, petitioner challenges the requirement that he name respondent as a beneficiary of the survivor benefit of his pension plan. We find no abuse of discretion in that requirement. There was a marital portion of the survivor benefit, just as there was a marital portion of *inter vivos* pension payments.

¶ 4         Second, petitioner challenges the refusal of the court to reimburse him for his contribution of $200,000 in nonmarital funds toward the purchase of a house at 2906 Hubbard Drive, Bloomington, Illinois (the Hubbard property). The court found that petitioner had failed to prove, by clear and convincing evidence, that the contribution was not a gift. That finding, we conclude, is not against the manifest weight of the evidence. The down payment was folded into the Hubbard property, which, in accordance with petitioner's intent, was conveyed to himself and respondent in joint tenancy. Presumably, this deed in joint tenancy speaks the whole truth. And, arguably, there was no clear and convincing rebuttal of that presumption.

¶ 5         Therefore, we affirm the judgment, with a slight adjustment: because the Hubbard property was conveyed to the parties in joint tenancy *before* the marriage, we modify the judgment so as to categorize the Hubbard property as nonmarital property instead of marital property. This is a modification purely in the interest of accuracy; it has no practical consequence. The court was correct to order the equal division of the net proceeds from the sale of the Hubbard property.

¶ 6                                  I. BACKGROUND

¶ 7         On August 15, 2016, petitioner, who was 61 years old and a manager at State Farm, filed a petition to dissolve his marriage to respondent, who was 54 years old and a guidance assistant at a junior high school. They had been married since July 15, 2005.

¶ 8         On May 24, 2018, in a document titled "Final Pre-Trial Recommendation," respondent listed the issues that she believed needed to be decided in the upcoming trial. One such issue, according to her, was whether petitioner should purchase life insurance to secure the maintenance that respondent was seeking.

¶ 9         The trial began on May 24, 2018. Petitioner testified that, when he and respondent got married, they decided to build a house together. They had been living in the houses that they

had occupied with their former spouses. Petitioner and respondent agreed that they would use the proceeds from selling those houses to make a down payment of $200,000 on a new home, the Hubbard property. They agreed to split the down payment of $200,000 down the middle by paying $100,000 apiece. On the day of the closing on the Hubbard property, petitioner was "extremely disorganized," and he showed up without bringing his $100,000. He had to telephone his credit union and request that the funds be wired. "I wasn't thinking," he testified, "[and] I asked them to wire the whole amount. So that's—and [respondent] didn't object to it. So that's how I ended up putting the $200,000 down." The credit union account, from which he withdrew the $200,000, was made up entirely of funds that he acquired before his marriage to respondent. Most of the money in the credit union account was the inheritance that he had received from his mother, who passed away about a year before he married respondent.

¶ 10          Petitioner's attorney asked him,

> "Q. So you're wanting $200,000 back?
>
> A. Correct."

¶ 11          Petitioner's payment of all $200,000 of the down payment must have confused the bank, or so he testified, because the bank put the Hubbard property in his name alone—although the bank had both him and respondent sign the mortgage on the Hubbard property. This ownership mishap was soon corrected when petitioner quitclaimed his interest in the Hubbard property to himself and respondent as joint tenants.

¶ 12          Petitioner's attorney asked him why he had added respondent as a title owner. Petitioner explained:

> "A. You know, it was a couple of things. One is that [respondent] got very
>
> upset when she found out it was only in my name. I didn't know it was only in

my name. We both missed it. And for the sake of the marriage, I wanted to put it in both of [our] names because that was our intent from the beginning.

Q. Did you intend to make a gift of the $200,000 to her?

A. No. It was just a mistake."

¶ 13 Respondent testified, on the other hand, that the extra $100,000 from petitioner was explicitly a gift, as petitioner had made clear to her. Her attorney asked her:

"Q. Has [petitioner] ever indicated to you that he anticipated or expected that you would make any reimbursement or payment to him in cash or otherwise for the property on Hubbard?

A. Not at all. In fact, when we were going to close, we were going to divide that[,] and at the last minute he said[,] ['L]et me do this for us. I want to make the whole deposit myself.[']

It kind of almost turned into an argument because I didn't want that to happen that way, and he wanted to make sure that I accepted this as a gift for us, even though I had sold my home and had $140,000 at the time to put 100 down towards the house. But there was definitely a joint ownership[,] and he knew that going in."

¶ 14 On the next day of the trial, August 27, 2018, respondent testified that it was when she and petitioner were riding together to the bank for the closing on the Hubbard property that petitioner broached the idea of making the entire down payment himself:

"A. [Petitioner] said that he wanted to put the whole deposit down on the home, which is not what we agreed upon. We almost had an argument over it. He ended up saying that he wanted to help us by doing that. That is his only response

to my asking why he would make a change at the last second.

Q. Now, when you say the whole deposit, are you referring to the down payment on the home?

A. Yes.

Q. Prior to being in route to the closing, did you and [petitioner] make efforts to each bring a check to the closing?

A. Yes. I had just closed on my previous home and had the check in hand.

Q. Okay. And so after having this discussion, what, if any, agreements did you and your husband make while you were in route to the closing in regard to his desire to put the entire deposit down out of his funds?

A. I asked him why he would change his mind. We had priorly agreed to share that equally. And he said that he wanted to do it for me, [']let me help you.['] I said, [']I don't need help, I don't know what you are talking about.['] And we had a discussion that was almost turning into an argument on the way to the closing. He eventually changed his tack and said, ['L]et me do this for us, I want to do this for us.['] And at that point we were at the closing, so I just went along with it."

¶ 15    On October 16, 2018, while his petition to dissolve the marriage was still pending, petitioner filed with the circuit court a document titled "Motion for Wife to Cooperate With and Execute Spousal Retirement Form(s) or, in the Alternative, Entry of a Bifurcated Judgment Prior to October 31, 2018." In this motion, petitioner alleged as follows. He had worked for State Farm since 1978. In April 2018, State Farm notified him that, pursuant to a "transition plan," his employment would be involuntarily terminated on October 31, 2018. Thus, it was time for him to

choose a pension option. According to the online retirement packet from State Farm (exhibit A of his motion), he had four options to choose from.

¶ 16       The first option was "Life Income." This option would provide the most monthly income for petitioner. His spouse, however, had to consent to his choice of this option because the maximization of the monthly income to petitioner during his lifetime was made possible by the omission of a survivor benefit:

> "Monthly income is paid to you for your lifetime. Payments cease on your death. This option usually provides the maximum amount of monthly income. If you are married and choose this option, your spouse must consent to your choice."

The amount of the monthly pension benefit under the "Life Income" option would be $7123.29.

¶ 17       The second option was "Life Income With Ten Years Certain." Like "Life Income," this option guaranteed a monthly income to petitioner for life. Not only that, but if petitioner died before payments had been made for either 10 years or the rest of his life expectancy, whichever was the lesser period, monthly payments in the same amount would continue to be made for the rest of the period to whomever petitioner designated as his beneficiary. But "[t]he amount of each monthly payment" in "Life Income With Ten Years Certain" would be "less than the Life Income payment." The monthly payment in "Life Income With Ten Years Certain" would be $6859.02, and there would be no more monthly payments from November 1, 2028, onward. Like "Life Income," "Life Income With Ten Years Certain" required the consent of the spouse. Naming a new beneficiary of the survivor benefit would require spousal consent too.

¶ 18       The third option was "Joint Life Income With 75% to Survivor." Under that option, monthly income would be paid to both petitioner and his joint annuitant while both of them were living. When either died, the survivor would receive a monthly life income equal to 75% of the

joint life income. Specifically, this option would pay $6230.74 a month to petitioner for life. If his joint annuitant died before him, his monthly benefit would decrease to $4673.06. If petitioner died before his joint annuitant, his joint annuitant would receive $4673.06 a month. "The joint annuitant," the State Farm brochure explained, "can be either your spouse or your dependent. A person is considered your spouse if you are legally married (as recognized under federal law) to him/her on your Effective Date of Retirement." According to the "Pension Calculation Statement" in exhibit A, petitioner had elected November 1, 2018, as his effective date of retirement.

¶ 19 The fourth and final option was "Life Income With 50% to Beneficiary." Under that option, monthly income would be paid to petitioner for his lifetime. If he died first, monthly income equal to half his monthly income would be paid to his beneficiary for life. If his beneficiary died first, there would be no adjustment to the monthly benefit paid to petitioner. Thus, to give specific dollar amounts, $6428.77 a month would be paid to petitioner for life, and, upon his death, $3214.39 a month would be paid to his beneficiary for life. Again, the beneficiary could be either petitioner's spouse or his dependent (meaning someone he could claim as a dependent in his federal income tax return). And, again, a person was considered to be petitioner's spouse if petitioner was legally married to the person on petitioner's effective date of retirement.

¶ 20 Petitioner alleged that on October 8, 2018, he logged onto State Farm's retirement benefits site and "chose the 'Life Income' option to maximize [his] pension payments." That choice would become effective, however, only if his spouse, respondent, gave her signed consent. Unless respondent signed a "Pension Election Authorization," his pension plan would be, automatically and irrevocably upon his retirement, the "Joint Life Income with 75% to Survivor"—or at least that seems to be what petitioner was suggesting in paragraph 12 of his affidavit. (Actually, according to the State Farm materials in the record, "Life Income With 50%

to Beneficiary" would be another acceptable choice without spousal consent: "If you are married and select an option other than Joint Life Income With 75% to Survivor or the Life Income With 50% to Beneficiary with your spouse as the survivor/beneficiary, you must obtain your spouse's consent.") Petitioner claimed that, unless respondent signed off on his pension choice, his monthly income would be only "6,320.74"—by which he apparently meant $6230.74, the monthly income under "Joint Life Income with 75% to Survivor":

> "12. As [the Pension Calculation Statement] illustrates, if my spouse is not willing to sign off on my pension choice, my monthly income for the rest of my life will be reduced from $7,123.29 to $6,320.74 [*sic*]. This is a monthly reduction of $802.55 or 11.3%.

> 13. My spouse will already receive a [qualified-domestic-relations-order] portion of my pension, so this additional reduction would be an unfair additional punitive arrangement.

> 14. My other option would be to not take my retirement on my [qualified termination date]. I would have to seek another job outside of State Farm or be unemployed until my divorce is final. Upon completion of the divorce, I could then elect to begin my retirement. However, if I choose that option, my medical insurance would not be subsidized[,] and my costs for [Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA)] insurance would double my monthly expense. In addition, I would not be entitled to the $200 monthly Medicare Supplement provide[d] by State Farm at age 65."

¶ 21 To avoid those undesirable consequences, petitioner requested that the circuit court "require Respondent to sign off on Husband's retirement forms, *inter alia*"—by which he meant

his retirement forms for "Life Income," in which respondent would waive a survivor benefit. Alternatively, petitioner requested that, prior to October 31, 2018, the court enter a bifurcated judgment of dissolution. In other words, petitioner requested that the court enter a judgment dissolving the parties' marriage but reserving all remaining issues (the ancillary issues) for future consideration. Respondent would then cease to be his spouse, leaving him free to choose the pension option that he desired, "Life Income," without her signed consent.

¶ 22　　　　On October 19, 2018, the circuit court held a hearing on petitioner's "Motion for Wife to Cooperate." In the hearing, respondent's attorney stated that she would never advise her client to give up survivor benefits, which federal law required pension plans to provide for the spouse. See 29 U.S.C. § 1055(c)(2)(A) (2018). "I don't know any lawyer who would have their client sign a waiver of surviving death benefits," respondent's attorney remarked. "That's a huge asset. That's a huge value to a party." At the conclusion of the hearing, the court took the matter under advisement.

¶ 23　　　　On December 31, 2018, the circuit court entered a bifurcated judgment of dissolution of marriage. At the same time, in a separate order, the court awarded maintenance to respondent, reserving for a future decision the remaining issues in the case.

¶ 24　　　　On January 14, 2019, petitioner suffered a stroke and was hospitalized.

¶ 25　　　　On January 18, 2019, the circuit court entered a decision on other ancillary issues. The court assigned the nonmarital property and nonmarital indebtedness and divided the marital property and marital indebtedness. The Hubbard property, which the court classified as marital property, was to be sold. After the mortgage and the expenses of the sale were paid, the remaining proceeds of the sale were to be divided equally between the parties. Also, the order contemplated the drafting and entry of qualified domestic relations orders:

"The following retirement, investment, mutual funds, and other accounts comprise both marital and non-marital property. Each party shall retain the non-marital portion of each, respectively. The marital portion of each, respectively, shall be divided pursuant to Qualified Domestic Relations Order ('QDRO') or Qualified Illinois Domestic Relations Order ('QILDRO').

i. State Farm 401(k) Plan—QDRO

ii. State Farm Retirement Plan/Pension—QDRO

iii. [Illinois Municipal Retirement Fund (IMRF)] Retirement Account—QILDRO."

Exhibit B of the order provided that the State Farm 401(k) plan, the State Farm pension, and the IMRF retirement account were to be divided by qualified domestic relations orders, giving each party a "one-half marital portion."

¶ 26　　　　On January 16, 2020, the circuit court held a hearing on a motion by respondent for contribution toward her attorney fees and appraisal fees. The hearing segued to the State Farm pension. A former spouse of petitioner, Lisa Fisher, testified that, after the entry of the bifurcated judgment of dissolution, Chad Fisher, who was petitioner's son by her, used a financial power of attorney from petitioner to choose "Life Income With 10 Years Certain." Chad Fisher made himself and a sibling (name unspecified) the after-death beneficiaries of the life income. We learn that from the following exchange, in which Lisa Fisher was asked:

"Q. Who was named as the beneficiary to [petitioner's] pension?

＊ ＊ ＊

[A.] His two children."

- 10 -

On May 1, 2019, pursuant to Chad Fisher's election of "Life Income With Ten Years Certain," petitioner began receiving his monthly pension.

¶ 27        Chad Fisher confirmed his willingness to ensure that respondent received her marital portion of the pension payments already made. In the view of respondent's attorney, however, that was not good enough. Respondent's attorney argued that, given the reduction in the monthly payment resulting from the election of "Life Income With Ten Years Certain" (and, hence, the corresponding reduction of the monthly amount payable to respondent), respondent should be designated as a beneficiary of half of the marital portion of the survivor benefit. The circuit court stated that, in considering this question, it would review the transcript of the October 19, 2018, hearing.

¶ 28        On February 13, 2020, the circuit court entered an agreed-upon order requiring petitioner to purchase life insurance in specified face amounts to secure maintenance.

¶ 29        Because the parties had been unable to agree on the wording of the qualified domestic relations orders and the qualified Illinois domestic relations order contemplated by the order of January 18, 2019, the circuit court held a hearing on February 25, 2020, to settle that controversy.

¶ 30        On March 2, 2020, the circuit court entered an order regarding the State Farm defined-benefit plan, the "Life Income With Ten Years Certain." The court prescribed the language of the domestic relations order. Also, the court ordered the payment to respondent of one-half the marital portion of any payment made by State Farm on petitioner's pension if petitioner died before the completion of the 10-year period of guaranteed payments.

¶ 31        On March 9, 2020, a qualified domestic relations order was entered that implemented the order of March 2, 2020.

¶ 32        On March 9, 2020, respondent filed a posttrial motion.

¶ 33        On March 16, 2020, petitioner filed a posttrial motion.

¶ 34        In count III of his posttrial motion, petitioner challenged the circuit court's refusal to reimburse him the $200,000 he had contributed from his nonmarital assets for the down payment on the Hubbard property. Petitioner pointed out that, under section 503(c)(1)(A)(ii) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/503(c)(1)(A)(ii) (West 2018)), if marital and nonmarital property were commingled by the contribution of one estate to the other and if the contributed property maintained its identity, the contributed property would not be transmuted into marital property and it would remain the property of the contributing estate. "[P]rior to the parties' marriage and from his individual account(s)," petitioner used his "non-marital assets" to make the down payment for the Hubbard property. For the following reasons, he argued that this contribution of his "non-marital estate to the marital estate" had maintained its identity as marital property:

> "At the time of the purchase, the appraised value [of the Hubbard property] was $360,000.00. The parties borrowed $150,000.00 for the purchase. Therefore, the equity upon the purchase of the property was approximately $210,000.00. The contribution from Petitioner's nonmarital estate established the majority of this equity."

Over the course of the marriage, the equity in the Hubbard property had grown to $324,134 as the parties paid down the mortgage without taking out any further loans. Given that increased equity, petitioner concluded, "$200,000.00 of that [was] clearly attributable to the contribution from [his] non-marital estate."

¶ 35 Alternatively, even if the $200,000 had lost its identity and consequently had been transmuted into marital property, count III of petitioner's posttrial motion claimed reimbursement under section 503(c)(2)(A) of the Act (*id.* § 503(c)(2)(A). Under that statutory provision, the contributing estate was to be reimbursed from the estate receiving the contribution notwithstanding any transmutation if the party requesting reimbursement could trace the contribution through clear and convincing evidence and establish that the contribution was not a gift. Petitioner argued that he had carried that burden of proof. He insisted that he had "paid the down payment with the intent of being reimbursed for one-half of that payment so [that] each party [would be] contributing $100,000 from their respective marital estates."

¶ 36 On May 14, 2020, the circuit court orally ruled on the posttrial motions. The court denied count III of petitioner's posttrial motion.

¶ 37 In explaining why it found no merit in count III, the circuit court noted that the parties bought the Hubbard property before they married, not after. And despite what the testimony suggested, the Hubbard property was, from the start, conveyed to both of them. The instrument of conveyance, the warranty deed (petitioner's exhibit No. 23), was in the record. It was dated June 27, 2005—18 days before the parties married—and it conveyed the Hubbard property to both petitioner and respondent in joint tenancy. (The court stated that the warranty deed was dated July 28, 2005, but actually it was dated June 27, 2005.) According to the typewriting of the warranty deed, the Hubbard property was conveyed "unto the Grantee, Charles Steven Fisher." After that typewritten phrase, however, an asterisk was penned in, and the phrase "and Penny O'Shea, as Joint tenants" was handwritten. (O'Shea was respondent's maiden name.) Not only that, but on June 28, 2005, both parties signed the note for $150,000 (petitioner's exhibit No. 24), a circumstance that, in the circuit court's mind, tended to confirm the intention of joint ownership.

After the marriage, on September 8, 2005, the parties signed a quitclaim deed (petitioner's exhibit No. 25) whereby petitioner quitclaimed to himself and respondent, in joint tenancy, the Hubbard property. But the court did not see the need for the quitclaim deed, considering that the warranty deed of June 27, 2005, already had conveyed the Hubbard property to them in joint tenancy.

¶ 38        It seemed significant to the circuit court that those instruments were the only documentation. "If, in fact, there was an intention to expect [respondent] to repay that $100,000," the court remarked, "you would have sure thought they would have executed some kind of document memorializing that agreement, and that wasn't done." In sum, then, to the extent that the Hubbard property was marital property, the court found that petitioner had failed to "overcome the burden of showing that it was not a gift to the marriage." The court could see an argument, however, that the Hubbard property was "nonmarital property and [that] they each had, essentially, [a] one[-]half interest in the property"—an argument that, as the court put it, "gets us to the same result."

¶ 39        On July 10, 2020, 57 days after the ruling on the posttrial motions, petitioner filed his notice of appeal.

¶ 40                                II. ANALYSIS

¶ 41                             A. Our Jurisdiction

¶ 42        Before addressing the merits of an appeal, we have an independent duty to make sure that we have jurisdiction over the appeal. See *In re Marriage of A'Hearn*, 408 Ill. App. 3d 1091, 1094 (2011). By describing this duty as "independent," we mean that we are obligated to scrutinize the basis of our jurisdiction even if the parties appear to regard our jurisdiction as beyond question. See *id.*

¶ 43　　　　　Neither party to this appeal questions our jurisdiction. We feel the need, however, to explain why we have jurisdiction. In the prolonged snowstorm of motions and other filings in this case, the basis of our jurisdiction might not be self-evident, and we do not wish to give the impression of being heedless of jurisdictional considerations. After all, one of the orders from which petitioner appeals is the order of January 18, 2019, which he describes as an "[o]rder on *all* issues"—but he also appeals from an order entered on March 2, 2020. (Emphasis added.) How can petitioner appeal from an order that, supposedly, mopped up all the remaining issues and also appeal from another order entered 409 days later? Is a circuit court's jurisdiction perpetual?

¶ 44　　　　　Another possible reason for concern is petitioner's waiting more than 30 days after the ruling on the posttrial motions to file his notice of appeal. The circuit court ruled on the posttrial motions on May 14, 2020, but he did not file his notice of appeal until July 10, 2020. Strangely, in his statement of jurisdiction, petitioner cites Illinois Supreme Court Rule 303 (eff. July 1, 2017), which, in paragraph (a)(1), requires that the notice of appeal be filed "within 30 days after the entry of the order disposing of the last pending postjudgment motion." Ill. S. Ct. R. 303(a)(1) (eff. July 1, 2017). It is almost as if his statement of jurisdiction is self-negating.

¶ 45　　　　　To find our way out of these perplexities, let us begin by examining the assumption that the order of January 18, 2019, was an "order all on issues." It was not. We have found an issue that the order of January 18, 2019, left unresolved. Before the trial, the circuit court requested from the parties a statement of issues that remained to be addressed. On May 24, 2018, in a document entitled "Final Pre-Trial Recommendation," respondent listed, among other issues, that of life insurance to secure maintenance. She wrote:

　　　　　　　"The parties have been unable to reach an agreement as to the following

　　　　　　issues:

- 15 -

        \*\*\*

        2. [Petitioner's] obligation to maintain life insurance to secure the payment

of maintenance."

See 750 ILCS 5/504(f) (West 2018) (permitting a maintenance award to "be reasonably secured, in whole or in part, by life insurance on the payor's life \*\*\* on such terms determined by the court"); *id.* § 510(c) (providing that, "[u]nless otherwise agreed by the parties in a written agreement set forth in the judgment or otherwise approved by the court, the obligation to pay future maintenance is terminated upon the death of either party"). The order of January 18, 2019, said nothing about life insurance to secure maintenance. The order left that claim unresolved. It was not until February 13, 2020, that the circuit court entered an agreed-upon order requiring petitioner to obtain life insurance in certain specified amounts "to secure his maintenance obligations." (The controversy over the wording of the domestic relations orders would not have prevented the order of January 18, 2019, from being final. See *In re Marriage of Platt*, 2015 IL App (2d) 141174, ¶ 15.)

¶ 46        By resolving the remaining issue in the case, namely, life insurance to secure maintenance, the order of February 13, 2020, started the 30-day period for filing a posttrial motion directed against the judgment. See Ill. S. Ct. R. 303 (a)(1) (eff. July 1, 2017); 735 ILCS 5/2-1203(a) (West 2018). Thirty days after February 13, 2020, was Saturday, March 14, 2020. When counting days, we include the final day of the period unless the final day was a Saturday, a Sunday, or a holiday, and then it is excluded. 5 ILCS 70/1.11 (West 2018). "If the day succeeding such Saturday, Sunday[,] or holiday is also a holiday or a Saturday or [a] Sunday[,] then such succeeding day shall also be excluded." *Id.* It follows that petitioner's deadline for filing a posttrial motion

- 16 -

was Monday, March 16, 2020. He filed his posttrial motion on that day. His posttrial motion, therefore, was timely.

¶ 47       Normally, petitioner would have had only 30 days after the ruling on the posttrial motions to file a notice of appeal. See Ill. S. Ct. R. 303(a)(1) (eff. July 1, 2017). On March 24, 2020, however—although one would never know it from the statement of jurisdiction in petitioner's brief—the supreme court issued M.R. 30370, *In re* Illinois Courts Response to COVID-19 Emergency. In paragraph 1, M.R. 30370 provided as follows:

> "1. The deadline to file a notice of appeal in the circuit court due on or after the date of this order is extended from 30 days to 60 days from the date of the circuit court judgment."

See Ill. S. Ct. R. 341(h)(4)(ii) (eff. Oct. 1, 2020) (requiring a "precise statement or explanation under the heading 'Jurisdiction' of the basis for appeal including the supreme court rule *or other law* which confers jurisdiction upon the reviewing court; the facts of the case which bring it within this rule or other law; and the date that the order being appealed was entered and any other facts which are necessary to demonstrate that the appeal is timely" (emphasis added)); *Jones v. State Farm Mutual Automobile Insurance*, 2018 IL App (1st) 170710, ¶ 26 (observing that, by virtue of its supervisory authority over Illinois courts, conferred by article VI, § 16, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 16), the supreme court may "take action that is otherwise inconsistent with Illinois Supreme Court rules"). Under Rule 303(a)(1), petitioner's notice of appeal would have been due on Monday, June 15, 2020 (not counting the preceding Saturday and Sunday). June 15, 2020, was after the date of M.R. 30370 (March 24, 2020), and, hence, M.R. 30370 was applicable to petitioner. He had the benefit of the extended period of 60 days for filing a notice of appeal. He filed his notice of appeal on July 10, 2020, which was 57 days after the

ruling of the posttrial motions on May 14, 2020. His appeal, therefore, is timely under M.R. 30370, and we have jurisdiction over his appeal.

¶ 48                           B. An Overstuffed Statement of Facts

¶ 49          Petitioner observes that the statement of facts in respondent's brief abounds in irrelevant material that is "not necessary for [us] to understand and decide the issues in this case." That is a fair criticism of respondent's brief. Petitioner overlooks, however, that his own brief is vulnerable to the same criticism. His statement of facts appears to be a blow-by-blow description of everything that happened in the case.

¶ 50          For example, several pages of his statement of facts are devoted to Whatley Property Ventures, Inc., in which petitioner was a partner with Brandon and Amanda Whatley. In the argument of his brief, however, petitioner does not mention Whatley Property Ventures, Inc., and it is unclear how that corporation is relevant to either of the issues that he raises on appeal. Or, to take another example, his statement of facts recounts a motion to withdraw by respondent's attorney and respondent's dispute with the attorney over $22,000 in fees. Again, the connection to the issues that petitioner raises is obscure.

¶ 51          A statement of facts "shall contain the facts necessary to an understanding of the case." Ill. S. Ct. R. 341(h)(6) (eff. Oct. 1, 2020). By negative implication, a statement of facts should omit facts that are unnecessary to an understanding of the case. Unless a fact is used in the argument of the brief or unless knowing the fact is helpful to understanding the argument, the fact is probably a distraction. Why include a fact in your statement of facts unless, in your argument, you are going to make something of that fact? Much of the statement of facts in both parties' briefs is confusing noise—confusing because when a statement of facts recounts, for example, an award of temporary maintenance, the reader is led to expect that the award of temporary maintenance

- 18 -

will be challenged in the argument. When, in the argument, the shoe never drops, the reader is thrown into a state of perplexity as to which facts in the statement of facts matter and which facts do not matter.

¶ 52                    C. The One-Half Marital Portion of Pension

Benefits Paid After Petitioner's Death

¶ 53                    1. *The Unilaterality of Petitioner's Choice of*

*"Life Income With Ten Years Certain"*

¶ 54          In its order of March 2, 2020, the circuit court remarked that petitioner's choice of the "Life Income with Ten Years Certain" was unilateral. The court found, "Respondent did not participate in, nor was she consulted for, the decision as to which pension benefit was selected by Petitioner." This finding, petitioner argues, "ignores the opportunities that were offered to [respondent] in October of 2018[,] which she ignored."

¶ 55          In support of that argument, petitioner cites a representation that his attorney made to the circuit court in the hearing of October 19, 2018:

> "[W]e also offered to sit down with State Farm and/or Hewitt [(apparently, the pension plan administrator)] and have [respondent] and her attorneys be educated on what the options are and what we can and cannot do. That was one of my proposals to [respondent's attorney's] office on October 5th personally [(meaning, apparently, October 5, 2018)] of let's sit down with them, get everybody educated. I—except for being told they don't want to waive any kind of survivor benefits in a fax, I have heard nothing until the memorandum today."

¶ 56    To quote from petitioner's reply brief: "Argument is not evidence[,] and argument by one's own advocate is certainly not persuasive in appellate argument even if it contains evidence."

¶ 57    Assuming, for the sake of argument, that the above-quoted statement by petitioner's attorney qualified as evidence, the circuit court could have reasonably chosen to place greater reliance on petitioner's motion of October 16, 2018. In that motion, he sought to compel respondent to "sign off on my pension choice," or he sought, alternatively, a bifurcated judgment of dissolution so that he could unilaterally sign off on his own pension choice, namely, "Life Income" with no survivor benefit. That does not sound like consultation with petitioner.

¶ 58    As it turned out, petitioner was disabled by a stroke before he elected a pension benefit, and his agent, Chad Fisher, made an election on his behalf. Chad Fisher chose "Life Income With Ten Years Certain." That option provided a survivorship benefit to Chad Fisher, and the survivorship benefit was funded by a reduction in the monthly payments that petitioner otherwise would receive while alive. As a matter of simple economics, adding to one side of the pensioner's death must take away from the other side. The record appears to lack any evidence that Chad Fisher consulted respondent before choosing "Life Income With Ten Years Certain." Therefore, we are unable to say that the circuit court made a finding that was against the manifest weight of the evidence by finding that "Respondent did not participate in, nor was she consulted for, the decision as to which pension benefit was selected by Petitioner."

¶ 59    2. *What Would Have Been but for Petitioner's Unilateral Choice*

¶ 60    In its order of March 2, 2020, the circuit court remarked that, if petitioner had not chosen the "Life Income With Ten Years Certain," respondent would have had a contractual right to a pension benefit of her own:

"15. Had the State Farm pension [qualified domestic relations order] been entered after the Judgment of Dissolution of Marriage and before Petitioner elected his pension benefit, Respondent would have received a separate interest pension benefit that would have been paid over her lifetime and would have been independent of the payment to Petitioner and would have been independent of the payment to Petitioner based on his lifetime."

¶ 61    "No testimony or written exhibits in the Record support this finding," petitioner argues. He might have a point here. We are unsure that this finding by the circuit court is correct. The "separate interest pension benefit" to which the order refers must be the "Joint Life Income With 75% to Survivor." To be the joint annuitant under that option, respondent would have had to be legally married to petitioner on the effective date of retirement, when his pension selection became irrevocable. After the judgment of dissolution, respondent was no longer legally married to him and, hence, was ineligible to be a joint annuitant, judging by the pension option descriptions in the record.

¶ 62    In any event, this question of *what would have happened* is relatively unimportant. See *In re Marriage of Burdess*, 2020 IL App (3d) 190342, ¶ 21 (observing that a reviewing court may affirm the circuit court's judgment on any basis that the record supports, without necessarily agreeing with the circuit court's reasoning). The important consideration, as we will explain, is that survivor benefits paid to the beneficiary would be no less pension benefits than those paid to petitioner while he was alive. The pension benefits, whether paid to petitioner or to his beneficiary, are partly marital property—as the circuit court pointed out by its quotation of section 503(b)(2) (750 ILCS 5/503(b)(2) (West 2018)).

¶ 63    3. *The Marital Property Interest in After-Death Pension Payments*

- 21 -

¶ 64    "Ultimately, the question to be answered in this case," petitioner says, is "whether [he] can be ordered to maintain [respondent] as a beneficiary to one-half of the marital portion of any payment made through the State Farm Retirement Plan/Pension as a result of his death prior to the end of the [10-]year period of guaranteed payments."

¶ 65    This question of "can" is a question of authority. Section 503(d) of the Act (750 ILCS 5/503(d) (West 2018)) not only empowered but required the circuit court to "divide the marital property." Subsection (b)(2) in turn provided that "*all* pension benefits *** acquired by or participated in by either spouse after the marriage and before a judgment of dissolution *** are presumed to be marital property." (Emphasis added.) *Id.* § 503(b)(2).

¶ 66    There appears to be no dispute that a portion of petitioner's defined-benefit plan from State Farm is marital property. During his final 13 years and 3 months of employment with State Farm, as his pension was growing, petitioner was married to respondent. Petitioner does not appear to dispute, then, that a portion of each pension payment made to petitioner while he is alive would be marital property. We are unclear why he takes a different position with respect to pension payments that would be made after his death. State Farm's brochure, which is in the record, does not differentiate between pension payments made to petitioner while he is alive and pension payments made to the designated beneficiary after petitioner dies:

"Life Income with Ten Years Certain

Monthly income is paid to you for your lifetime. If you die before payments have been made for a certain period equal to the lesser of:

[(1)] 10 years or

[(2)] Your life expectancy,

- 22 -

payments in the same amount will continue to your designated beneficiary for the remainder of such period."

¶ 67    Thus, after petitioner's death, for the remainder of the period, pension payments will continue without a hitch. The nature of the payments will not change if petitioner dies. They will still be pension benefits—and "all pension benefits *** acquired by or participated in by either spouse after the marriage and before a judgment of dissolution *** are presumed to be marital property." *Id.* § 503(b)(2).

¶ 68    Petitioner's reasons (or his agent's reasons) for choosing one pension option over another are relatively unimportant. Regardless of the pension option—regardless of whether all of the pension benefits are paid to petitioner or some of the pension benefits are shifted to his designated beneficiaries—a portion of the pension benefits is marital property. That does not change by deferring payment of pension benefits until after petitioner's death. Petitioner should not be allowed to deprive respondent of her full one-half marital portion of the pension benefits by essentially assigning pension benefits to his children as after-death beneficiaries. By allocating to respondent her one-half marital portion of any pension benefits paid after petitioner's death, the circuit court did not abuse its discretion. See *In re Marriage of Jerome & Martinez*, 255 Ill. App. 3d 374, 393 (1994) (holding "that a court has broad discretion in distributing marital property" and that, "absent an abuse of discretion, the court's distribution will not be overturned upon review").

¶ 69        D. The Down Payment of $200,000 for the Hubbard Property,

Which Was Conveyed to the Parties in Joint Tenancy

¶ 70    Section 503(a) of the Act provides that "the court shall make specific factual findings as to its classification of assets as marital or nonmarital property, values, and other factual findings supporting its property award." 750 ILCS 5/503(a) (West 2018). Petitioner complains

that, in its order of January 18, 2019, the circuit court violated section 503(a) by simply finding the Hubbard property to be marital property and ordering it to be sold and the net proceeds of the sale to be divided equally between the parties. In his testimony, petitioner had raised the claim that $200,000 of the Hubbard property was his nonmarital property because, out of his nonmarital credit union account, he had made the down payment of $200,000 for the Hubbard property. Simply classifying the Hubbard property as marital property failed to specifically address that claim. Section 503(a) required the court to "make specific factual findings as to," or with respect to, the classification of the Hubbard property as entirely marital property. That would have meant specifically addressing petitioner's claim that $200,000 of the Hubbard property was his nonmarital property.

¶ 71        Statutes are to be obeyed, and the trouble with *impliedly* disposing of a claim such as petitioner's is that the party will be unsure whether the court deliberately rejected the claim or just overlooked it. We are unable to see, though, how petitioner ultimately was prejudiced by the circuit court's initial noncompliance with section 503(a), considering that (1) count III of his motion for reconsideration raised the down payment and (2) the circuit court denied count III and, in doing so, specifically found that petitioner had failed to rebut the presumption that the $200,000 was a gift. That was a "specific factual finding[ ]." *Id.*

¶ 72        We are unconvinced that the finding is against the manifest weight of the evidence. It appears from the warranty deed of June 27, 2005 (petitioner's exhibit No. 23), that the Hubbard property was nonmarital property that the parties owned as joint tenants with right of survivorship. See *Engelbrecht v. Engelbrecht*, 323 Ill. 208, 213 (1926) (holding that "[w]here the conveyance is made to two or more persons 'as joint tenants,' " a joint tenancy with right of survivorship is created and that "the use of the words 'and not as tenants in common' adds nothing"). "It is well

settled that instruments which purport to create joint tenancies presumably speak the whole truth and those who claim adversely thereto must, in order to prevail, prove by clear and convincing evidence that a gift was not intended." *Edwards v. Miller*, 61 Ill. App. 3d 1023, 1028 (1978). Arguably, petitioner failed to carry his heavy burden of proof. A reasonable trier of fact could find petitioner's story to be implausible. To believe petitioner, one would have to believe that he paid an extra $100,000 by mistake, thereby making a loan to respondent that she did not request—or, apparently, even need, considering that she had come to the closing prepared to pay $100,000 that she possessed from the sale of her own house. Arguably, an accidental overpayment to the tune of $100,000 is a little hard to believe. Reading petitioner's testimony, one might think that he had inadvertently picked up his tablemate's bill at a restaurant.

¶ 73        In short, we defer to the circuit court's assessment of credibility. See *In re Marriage of Miller*, 2015 IL App (2d) 140530, ¶ 41. We cannot say that it was arbitrary or unreasonable of the court to find that the warranty deed spoke the entire truth—that both parties, as joint tenants, had "*equal* undivided interests in the property" (emphasis added) (*Estate of Jezewski v. Jaworski*, 2019 IL App (1st) 170100, ¶ 19)—and that petitioner had failed to prove, by clear and convincing evidence, that he did not intend a gift by having the property conveyed to him and his soon-to-be-spouse in joint tenancy (see *Edwards*, 61 Ill. App. 3d at 1028). See *Miller*, 2015 IL App (2d) 140530, ¶ 40 (explaining that "[a] decision is against the manifest weight of the evidence if the opposite conclusion is clearly evident or if the decision is unreasonable, arbitrary, or not based on the evidence").

¶ 74                                III. CONCLUSION

¶ 75    For the foregoing reasons, we modify the circuit court's judgment so as to classify the Hubbard property as nonmarital property instead of marital property, and we affirm the judgment as modified.

¶ 76    Affirmed as modified.